USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: 9/8/20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
   COLGATE-PALMOLIVE CO.,                          :
                                                               :
                                               Plaintiff, :
        -against-                                   :         1:18-cv-09982(ALC)
                                                                   :
   LANFRANCHI NORTH AMERICA, INC. AND     :         **OPINION AND ORDER**
   LANDFRANCHI S.R.L.,                            :
                                                                   :
                                         Defendants. :
                                                                   :
                                                                   :
-------------------------------------------------------------x

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiff Colgate-Palmolive Company ("Colgate") brings this action against Defendants Lanfranchi S.r.l ("Lanfranchi"), and its subsidiary, Lanfranchi North America, Inc. ("Lanfranchi N.A.") for breach of contract (Count I), breach of express warranty (Count II), and breach of the implied covenant of good faith and fair dealing (Count III). (ECF No. 1 or Compl. at ¶¶ 57–75). Defendants now move to dismiss all claims against Lanfranchi, and Plaintiff's implied covenant claim. Defendants' motion with respect to dismissing Lanfranchi is DENIED, however, the motion to dismiss the implied covenant claim is GRANTED.

## BACKGROUND

Colgate is a global corporation that produces and distributes oral care, personal care, home care, and pet products. (*Id.* at ¶ 4). Colgate is incorporated in Delaware and maintains its principal place of business in New York. (*Id.*)

Lanfranchi is a family-owned business organized under the laws of Italy that specializes in the design, manufacturing, and marketing of machinery for product

assembly lines involving plastic bottles and containers. (*Id.* at ¶ 5). Lanfranchi N.A. is a wholly-owned subsidiary of Lanfranchi, organized under the laws of Florida with a principal place of business in Florida. (*Id.* at ¶ 6).

In 2013, Colgate entered into an agreement with Lanfranchi N.A. for the purchase of equipment needed for Colgate's high-speed, liquid hand soap assembly line at its Greenwood, South Carolina manufacturing facility. (*Id.* at ¶¶ 13–14, 18). Through this Master Equipment Purchase Agreement ("Agreement"), Colgate purchased a "Pucker" and a "De-Pucker" machine as well as spare parts for both. (*Id.* at ¶ 32; *Id.* at Ex. A or "Agmt"). "Pucker" equipment places and orients empty plastic bottles on the assembly line, and "De-Pucker" equipment removes the bottles after they are filled. (*Id.* at ¶ 16).

Pursuant to the Agreement, Lanfranchi N.A. agreed to deliver and install the two industrial machines at Colgate's Greenwood facility. (Agmt at § 4.11). Lanfranchi agreed the equipment would "meet detailed specifications and functional and operational performance requirements, including installation and start-up services… drawings or other data provided by Colgate, and machine acceptance protocols (the 'Specifications') all as agreed by Colgate." (Agmt. at § 6.2). The "Specifications" "outlined the design, technical requirements, and operations speed and efficiency requirements for the Pucker and De-Pucker." (Compl. at ¶ 26; Compl. at Exs. B and C). The Agreement further warranted and covenanted, among other things, that the machinery and spare parts "shall be…of good and suitable quality and in good condition, …conform in all respects to…the requirements set forth in the Agreement, … perform in accordance with the performance requirements set forth…including with respect to capability, operational speed and

efficiency, …be free of any defects in design, workmanship or materials…[and] be merchantable and fit and sufficient for the purpose intended[.]" (Agmt. at § 6.3).

The warranties extended for 24 months after the Agreement's acceptance date, and in the event of a breach, Lanfranchi N.A. agreed that, within 30 days, it would "replace or modify the Equipment or Spare Parts, as applicable…" (Agmt. at § 6.4). In exchange, Colgate agreed to ensure the Equipment was "properly maintained and operated by well-trained and competent operators" throughout the warranty period. (*Id.*)

Immediately after the installation of the machines in early 2016, Colgate experienced the following problems:

> (i) a broken camera on the Pucker; (ii) an incorrectly installed grease pump on the De-Pucker; (iii) failed anti-vibration pads on the Pucker and De-Pucker; (iv) a failed pulley for the timing belt; (v) an unapproved modification on the De-Pucker; (vi) electrical issues with the Pucker; and (vii) incorrectly programmed photoeyes.

(Compl. at ¶ 34). Colgate initially complained about these issues, but alleges that Defendants failed to resolve them. (*Id.*)

Colgate emailed Mario Lanfranchi on June 3, 2016 "to escalate complaints" about the Equipment. (*Id.* at ¶ 35). Colgate alleges that Mario Lanfranchi co-owns Lanfranchi with his brother, Alessio Lanfranchi. (*Id.* at ¶ 5). Defendants characterize Mario as "an officer of Lanfranchi N.A." (ECF No. 23 or Defs. Br. at 3). In its email, Colgate requested that Lanfranchi send an electrical and a mechanical technician from Italy to the Greenwood site to resolve the issues. (Compl. at ¶ 35).

Over time, Colgate's issues with the machines increased. The additional problems included "low air pressure on the Pucker," "dropped bottles on the De-Pucker," and "bottle jams on both the Pucker and De-Pucker." (*Id.* at ¶ 36). The machines also

3

operated at a speed significantly slower than the speed agreed to in the Specifications. (*Id.* at ¶¶ 37–38).

Lanfranchi technicians came to the Greenwood facility repeatedly throughout 2016 and 2017, but were unable to resolve the issues with the Pucker and De-Pucker or to ever get the machines to operate at the agreed-upon speed. (*Id.* at ¶ 40). During one such trip in late November/early December 2017, "Lanfranchi stated that it would need to improve and redesign the Pucker and De-Pucker in order for them to meet the requirements set forth in the Specifications, but provided no plan for how it would do so." (*Id.* at ¶ 41).

Colgate suffered large financial burdens as a result of the malfunctioning equipment. Colgate had to shut down its entire Greenwood assembly line or run it at much lower speeds, impeding "productivity and the ability of Colgate to meet its production requirements" and thus, requiring Colgate "to engage third-party manufacturers to meet its production requirements, resulting in millions of dollars in additional production costs." (*Id.* at ¶ 42). Colgate also was forced to pay "Lanfranchi N.A. hundreds of thousands of dollars for additional services, parts, and modifications" and ultimately, needed "to spend millions of dollars to purchase and install replacement equipment…and remove the Lanfranchi equipment." (*Id.* at ¶ 42).

Colgate sued both Lanfranchi N.A. and Lanfranchi for breach of contract (Count I), breach of express warranty (Count II), and breach of the implied covenant of good faith and fair dealing (Count III). (*Id.* at ¶¶ 57–75). Although Lanfranchi was not a party to the Agreement, Colgate alleges that Lanfranchi N.A. acted as Lanfranchi's agent and

alter ego while transacting with Colgate, making it appropriate to pierce the corporate veil and hold Lanfranchi liable. (*Id.* at ¶¶ 46–56).

Defendants now move to dismiss all claims against Lanfranchi, and to dismiss Colgate's implied covenant claim against all Defendants.

## LEGAL STANDARD

A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

"In deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must "accept[ ] all factual allegations in the [pleading] as true, and draw[ ] all reasonable inferences in the [plaintiff's] favor." *VFS Financing, Inc. v. Falcon Fifty LLC*, 17 F. Supp. 3d 372, 379 (S.D.N.Y. 2014) (internal quotation marks omitted).

## DISCUSSION

Defendants' motion to dismiss rests on two arguments: First, that Colgate failed to allege facts that, if true, are sufficient to support piercing the corporate veil to hold the parent company, Lanfranchi, liable; and second, that Colgate's implied covenant claims should be dismissed as duplicative of its breach of contract claim. I will address the veil-piercing argument first, then discuss the implied covenant claim.

### I. Piercing the Corporate Veil

"Under New York choice of law principles, the law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on

shareholders." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995); *see Nat'l Gear & Piston, Inc. v. Cummins Power Systems, KKC*, 975 F. Supp. 2d 392, 401 (S.D.N.Y. 2013). Lanfranchi N.A. is organized under the laws of Florida, accordingly, Florida law governs this Court's veil-piercing analysis.

> In Florida, to pierce the corporate veil, a plaintiff must allege:
> (1) the shareholder dominated and controlled the corporation to such an extent that the corporation's independent existence, was in fact non-existent and the shareholders were in fact alter egos of the corporation; (2) the corporate form must have been used fraudulently or for an improper purpose; and (3) the fraudulent or improper use of the corporate form caused injury to the claimant.

*Netjets Aviation, Inc. v. Peter Sleiman Development Group, LLC*, 3:10-cv -483, 2011 WL 11560026, at *4 (M.D. Fla. June 13, 2011) (quoting *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1349 (11th Cir. 2011). "'Shareholders' include…parent companies who own their subsidiaries." *Molinos*, 633 F.3d at 1349. For veil-piercing purposes…[i]mproper conduct is present only in cases in which the corporation was a mere device or sham to accomplish some ulterior purpose or where the purpose is to evade some statute or to accomplish some fraud or illegal purpose." *North American Clearing, Inc. v. Brokerage Computer Systems, Inc.*, 666 F. Supp.2d 1299, 1306 (M.D. Fla. 2009) (internal quotations marks omitted) (alterations in original). However, actual fraud is not a perquisite. *See Zhejiang Dushen Necktie Co., Ltd. v. Blue Med., Inc.*, No. 16-civ-24679, 2017 WL 4119604, at *3 (S.D. Fla. Sept. 18, 2017).

Defendants focus on prongs two and three, arguing that Plaintiff fails to allege facts indicating Lanfranchi's fraudulent or improper use of the corporate form or any injury Plaintiff suffered as a result of such an alleged improper use.

**A. Improper Conduct**

First, Defendants emphasize the complaint's statement that "Lanfranchi organized Lanfranchi N.A. for the purpose of gaining access to the United States market for its products that it otherwise could not enter from its overseas operation." (Defs. Br. at 6) (quoting Compl. at ¶ 47). Defendants argue that through this allegation, Plaintiff acknowledges a proper purpose for which Lanfranchi N.A. was formed, precluding any plausible inference to the contrary. (*Id.*)

Defendants' argument is unpersuasive. The fact that Lanfranchi N.A. may have been organized to allow Lanfranchi access to the United States market does not preclude the possibility that it *also* was organized to accomplish some other improper purpose.

Second, Defendants assert that neither Colgate's allegation that Lanfranchi N.A. has insufficient funds to satisfy a judgment against it, nor Colgate's allegations of contractual breach, amount to improper conduct warranting piercing the corporate veil. (Defs. Br. at 6–7). In support of this position, Defendants predominantly rely on three Florida appellate court cases.

*Geigo Properties, L.L.P. v. R.J. Gators Real Estate Group, Inc.*, concerns the use of a shell corporation to lease restaurant space. 849 So.2d 1109, 1110 (Fla. Dist. Ct. App. 2003). Reginald Timoteo owned several restaurants through corporations known as R.J. Gators. *Id.* One of Timoteo's corporations, R.J. Gators Real Estate Group, Inc., was incorporated in 1995 to purchase a specific piece of real estate. *Id.* When the purchase fell through, the corporation became "inactive until 1999, when it entered into a lease with [plaintiff] Geigo." *Id.*

Timoteo made the initial lease payment with funds obtained from outside the corporation as "R.J. had no assets and no bank account." *Id.* R.J. never moved into the lease property or made additional payments, abandoning the lease and incurring a $37,500 judgment against it. *Id.* Geigo was unable to collect on the judgment and sought to pierce the corporate veil to collect from a different corporation or Timoteo personally. *Id.*

The trial court declined to pierce the corporate veil, deciding, based on testimony, "that R.J, was not organized or used to evade creditors, and…there was no improper conduct which would warrant piercing the corporate veil." *Id.* The Florida appellate court upheld the trial court's decision, distinguishing this case from others with similar fact patterns where the court found improper conduct and pierced the veil. *Id.* at 1110–11.

In one distinguished case, *Ocala Breeders' Sales Co. v. Hialeah, Inc.*, a Florida appellate court reversed the trial court's decision not to pierce the corporate veil to hold the parent company of a wholly-owned subsidiary liable where the subsidiary breached a contract with Plaintiff. 735 So. 2d 542, 543 (Fla. Dist. Ct. App. 1999). The parent company owned and operated a racetrack and the subsidiary ran the non-race-related activities at the track. *Id.* The subsidiary "never had a bank account…[had] never been capitalized…turn[ed] its receipts directly over to [the parent]…[and] had never earned a profit." *Id.*

Plaintiff entered into a lease with the subsidiary for the use of a portion of the track's sales pavilion. *Id.* Under the lease, the subsidiary agreed to renovate and refurbish the pavilion. *Id.* The subsidiary "failed to make the required improvements" and Plaintiff filed suit and obtained a judgment against the subsidiary. *Id.* After learning that the

subsidiary had no assets to satisfy the outstanding judgment, Plaintiff sought to pierce the corporate veil and hold the parent liable. The trial court declined, and Plaintiff appealed. *Id.*

The Florida appellate court reversed, concluding that the undisputed facts showed that the subsidiary was the mere instrumentality of the Parent and used by the parent "to 'mislead creditors or to perpetrate a fraud upon them.'" *Id.* In particular, the court emphasized that the parent and subsidiary were "controlled by the same person," the parent owned all of the subsidiary's stocks, the subsidiary had never been capitalized, all funds earned by the subsidiary were deposited into the parent's account, the subsidiary's financial obligations were paid by checks drawn on the parent's account, and the subsidiary had no bank account. *Id.* In short, "[u]nder the circumstances, [the subsidiary] entered into the agreement though it did not have the ability to fulfill the contract. As such, [the subsidiary] fraudulently mislead [Plaintiff]." *Id.* at 543–44.

The *Geigo* court explained why *Ocala* was distinguishable. The court reasoned that in *Ocala*, "the corporation of substance operated the business and received all of the income, leaving the shell corporation with no assets to pay the judgment rendered against it when it breached." *Geigo*, 849 So. 2d at 1111. In other words, there was evidence that the parent company was operating the subsidiary as a shell, ensuring that it lacked assets as it misleadingly conducted business consistently on the parent's behalf. The same evidence did not exist in *Geigo* where the company at issue essentially was nonexistent and had been in no transactions prior to the lease at issue. Together, these two cases establish that "the mere use of a shell corporation to enter into [a] lease" or contract "and the subsequent breach of the lease [or contract]" do "not constitute the type of improper

conduct necessary to pierce the corporate veil." *Id.* at 1111. However, where there is evidence that a parent undercapitalized or depleted the assets of a subsidiary, which then entered a contract for the benefit of the parent without the "present ability or expectation of the ability to perform," a court may find improper conduct sufficient to pierce the corporate veil. *Southeast Capital Inv. Corp. v. Albemarle Hotel, Inc.*, 550 So. 2d 49, 51 (Fla. Dist. Ct. App. 1989).

Here, Colgate alleges that "Lanfranchi N.A. carries on no operations that are independent of Lanfranchi, and instead acts solely at the direction of Lanfrachi to negotiate contracts, provide product specifications, and act as a North American point of contact for United States buyers of Lanfranchi equipment seeking technical support." (Compl. at ¶ 49). Lanfranchi N.A., the complaint alleges, has "no ability to independently satisfy" the sales contracts it enters into on Lanfranchi's behalf. (*Id.* at ¶ 50). Colgate provides that Mario and Alessio Lanfranchi, the owners of Lanfranchi, direct the actions of Lanfranchi N.A. and Colgate believes that "Lanfranchi N.A. does not maintain its own accounts, books, or finances – Lanfranchi N.A.'s operations are fully funded by Lanfranchi and Lanfranchi N.A. is not financially independent of Lanfranchi." (*Id.* at ¶¶ 52–53). This belief is based, in part, on Colgate's alleged knowledge that the equipment they received was provided entirely by Lanfranchi and that Italy-based Lanfranchi personnel "provided the vast majority of the services under the Agreement." (*Id.* at ¶ 53).

Given the above allegations and the significant warranties to Colgate Lanfranchi N.A. issued and failed to honor, Colgate alleges that "Lanfranchi and its principals used Lanfranchi N.A. as a shell to sell Lanfranchi products in an attempt to make Lanfranchi judgment-proof[.]" (*Id.* at ¶ 55).

If Colgate's allegations are true, this case presents facts similar to those in *Ocala*. Unlike in *Geigo*, where there was no evidence of improper conduct beyond the use of an alleged shell corporation and breach of a contract, here there would be precisely the type of evidence Florida courts in these two cases explain is necessary to pierce the corporate veil. Accordingly, contrary to Defendants' arguments, *Geigo* actually counsels against dismissal here.

The other two cases Defendants rely on are similarly unhelpful. In *WH Smith, PLC v. Benages & Associates, Inc.* and *North American Clearing, Inc. v. Brokerage*, Florida appellate courts declined to pierce the corporate veil based on allegations that the parent companies at issue instructed their subsidiaries and alleged alter egos to breach contracts with the plaintiffs. 51 So. d 577, 582–83 (Fla. Dist. Ct. App. 2010); 666 F. Supp. 2d 1299, 1308 (M.D. Fla. 2009). But in both cases, again, the only considered evidence of improper conduct was the subsidiary's breach of contract. The courts were not presented with evidence of intentional undercapitalization or asset draining designed to preclude recovery. These cases reaffirm *Geigo*'s holding that a contractual breach, even at the instruction of the parent, while potentially relevant to the alter ego analysis, is not sufficient to establish improper conduct warranting piercing the corporate veil.

Defendants are correct that "[t]hose who seek to pierce the corporate veil in Florida carry a 'very heavy burden[,]'…[but] [a]t the motion to dismiss stage, a plaintiff need only allege facts which support a plausible basis for alter ego as a theory of liability." *Damian v. Yellow Brick Capital Advisers (UK) Limited*, 2019 WL 5887360, at *7 (Nov. 12, 2019) (quoting *Gov't of Aruba v. Sanchez*, 216 F. Supp. 2d 1320, 1362 (S.D. Fla. 2002). Further, the question of whether to pierce the corporate veil is a fact-intensive

inquiry that courts should be reluctant to decide at this stage of litigation. *See Dickinson v. Hoyt*, No. 3:16-cv-69, 2017 WL 3597512, at *3 (N.D. Fla. Jun. 19, 2017) (quoting *Tara Prods., Inc. v. Hollywood Gadgets, Inc.*, No. 09-CV-61436, 2010 WL 1531489, at *12 (S.D. Fla. Apr. 16, 2010) ("At the motion to dismiss stage, 'courts are reluctant to decide the fact intensive question of whether a corporate entity is merely an alter ego to protect an individual defendant from liability.'"); *NetJets Aviation Inc*, 2011 WL 11552881, at *1 (whether the corporate form was used fraudulently or for an improper purpose is a "fact-intensive inquiry). Colgate has pled sufficient facts alleging improper conduct to establish a plausible basis for piercing the corporate veil.

**B. Injury**

Defendants contend that even if I conclude Colgate has plausibly alleged improper conduct, its complaint should be denied for the independent reason that it contains no allegations of injuries Colgate suffered because of Lanfranchi's improper conduct. (Defs. Br. at 10–11). Defendants first take issue with the Complaint's allegation that, "[a]s a result of Lanfranchi N.A.'s breaches, Colgate has sustained damages in an amount that will be proven at trial." (*Id.*) (quoting Compl. at ¶ 61). Defendants argue that this allegation acknowledges that the source of Colgate's injuries is Lanfranchi's N.A.'s contractual breach as opposed to a misuse of corporate form. (*Id.*) Relatedly, Defendants emphasize that until Colgate obtains a judgment against Lanfranchi N.A. and the subsidiary is unable to satisfy the judgment, Colgate's inability to obtain compensation is speculative, thus, there currently is no injury stemming from Lanfranchi's misuse of the corporate form. (*Id.*)

Defendants' arguments are unsupported by any law and ignore the standard for a Rule 12(b)(6) motion. At this stage of the litigation, I am required to accept the allegations in the complaint as true. Accordingly, I must assume that Lanfranchi N.A. would be unable to satisfy a judgment entered against it in this matter. Given that assumption, Colgate has alleged plausibly that Lanfranchi N.A.'s inability to uphold its warranties to Colgate—the cause of Colgate's alleged losses—is the result of Lanfranchi's improper use of its subsidiary as a shell.

## II. Implied Covenant Claim

"Implicit in every contract is an implied covenant of good faith and fair dealing…a pledge that neither party to the contract will have the effect of destroying or injuring the right of the other party to receive the fruit of the contract, even if the terms of the contract do not explicitly prohibit such conduct." *Gutierrez v. Gov't Employees Ins. Co.*, 136 A.D.3d 975, 976 (2d Dep't N.Y. Sup. Ct. App. Div. 2016) (internal citation omitted). Under New York law, "[c]laims of breach of the implied covenant ... must be premised on a different set of facts from those underlying a claim for breach of contract." *Fleisher v. Phoenix Life Ins. Co.*, 858 F. Supp. 2d 290, 299 (S.D.N.Y. 2012) (quoting *Deutsche Bank Sec. Inc. v. Rhodes,* 578 F.Supp.2d 652, 664 (S.D.N.Y.2008)). "Accordingly, '[a] claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract." *Fleisher*, 858 F. Supp. 2d at 299 (quoting *ICD Holdings S.A. v. Frankel,* 976 F.Supp. 234, 243–44 (S.D.N.Y.1997)).

Defendants argue that Colgate's claim for breach of the implied covenant of good faith and fair dealing should be dismissed because it is premised on the same facts as Colgate's breach of contract claim. (Defs. Br. at 11–12). I agree.

Colgate's breach of contract claim is based on allegations that Lanfranchi N.A. breached the terms of the parties' agreement in that in failed to deliver equipment that met the specifications the parties agreed to and failed to replace or modify the faulty equipment. Colgate's implied covenant claim is based on allegations that Lanfranchi N.A. acted in bad faith "by failing to provide a meaningful solution to bring the Pucker and De-Pucker up to production requirements set forth in the Specifications," (*Id.* at ¶ 72), and "[b]y entering into the Agreement with no intent or ability to perform its duties." (ECF No. 24 or Pl. Br. at 17) (quoting *Id.* at ¶ 72). Both claims rely on the allegations concerning Lanfranchi N.A.'s failure to replace or satisfactorily repair the equipment as required by the terms of the contract. Thus, Colgate's implied covenant claim must be dismissed as redundant of its breach of contract claim.

## CONCLUSION

Defendants' motion to dismiss with respect to Defendant Lanfranchi is DENIED. Defendants' motion to dismiss with respect to Colgate's implied covenant claim is GRANTED.

**SO ORDERED.**

**Dated:** September 8, 2020

**New York, New York**  **ANDREW L. CARTER, JR.**
**United States District Judge**